**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**ZAKITA D.,** *on behalf of*
**Z.D.C., a minor,**

       **Plaintiff,**

**v.**                                            **Case No. 2:24cv711**

**FRANK BISIGNANO,
Commissioner of Social Security,**

       **Defendant.**

## OPINION AND ORDER

Zakita D. ("Plaintiff or Plaintiff's Mother"), proceeding on behalf of her minor child, Z.D.C., filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of Defendant Frank Bisignano, Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for supplemental security income ("SSI") under the Social Security Act. On April 25, 2025, the parties consented to the jurisdiction of the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(c)(1), and Federal Rule of Civil Procedure 73. ECF No. 12.

Presently before the Court are Plaintiff's brief in support of reversal and remand of the Commissioner's decision denying benefits[1], ECF Nos. 9–10, and the Commissioner's brief in support of the Commissioner's decision denying benefits, ECF No. 14. After reviewing the briefs, the undersigned issues this opinion without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Eastern District of Virginia Local Civil Rule 7(J). For the following reasons, the

---

[1] Pursuant to the Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g), parties are no longer required to file dispositive motions, and instead file a brief for the requested relief. Accordingly, the Court will treat Plaintiff's "Motion for Summary Judgment" as a brief for the requested relief.

undersigned **FINDS** that the final decision of the Commissioner should be **VACATED** and **REMANDED.**

## I. <u>PROCEDURAL BACKGROUND</u>

Plaintiff protectively filed an application for SSI on July 26, 2022, alleging disability due to symbrachydactyly.[2]  R. at 52.[3]  Plaintiff's application was initially denied on March 13, 2023, and again denied upon reconsideration on August 14, 2023.  R. at 51, 62.  Plaintiff requested a hearing before an administrative law judge.  R. at 77.

A hearing was held on June 5, 2024, at which Plaintiff's Mother appeared with counsel before Administrative Law Judge Maryann Bright ("the ALJ").  R. at 28–50.  Plaintiff's Mother testified at the hearing.  R. at 34–50.  On August 16, 2024, the ALJ issued a decision finding Z.D.C. not disabled.  R. at 17–23.  Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on October 21, 2024, making the ALJ's decision the final decision of the Commissioner.  R. at 1–3.

Having exhausted her administrative remedies, on December 12, 2024, Plaintiff filed a Complaint for judicial review of the Commissioner's decision.  ECF No. 1.  In accordance with the Supplemental Rules for Social Security Actions, on April 21, 2025, Plaintiff filed a brief in support of reversal and remand of the Commissioner's decision.  ECF No. 10.  On May 21, 2025, the Commissioner filed a brief in support of the Commissioner's decision denying benefits.  ECF

---

[2] Symbrachydactyly is a rare congenital hand difference where one of a baby's hands is smaller than the other one, and the fingers on the small hand are short or small. *Symbrachydactyly (Short, Joined Fingers)*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/23189-symbrachydactyly (last visited Mar. 31, 2026).

[3] "R." refers to the certified administrative record that was filed under seal on February 6, 2025.  ECF No. 5, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

No. 14.  Plaintiff filed a reply on June 4, 2025.  ECF No. 15.  Because the matter is fully briefed, it is now ripe for recommended disposition.

## II. <u>RELEVANT FACTUAL BACKGROUND</u>

The record included the following factual background for the ALJ to review:

Z.D.C. was born with symbrachydactyly.  R. at 252.  She was five months old when her application for SSI was filed, and two-and-a-half years old at the time of the ALJ's decision.  R. at 52.  Her medical records largely involve her symbrachydactyly diagnosis and treatment, but she also suffers from complex febrile seizures, which may occur when she is ill and has a fever.  *See e.g.*, R. at 386–411, 540.

When Z.D.C. was four weeks old, she first saw an orthopedist, Dr. Bennett, who diagnosed her with symbrachydactyly of the right hand.  R. at 252.  Dr. Bennett advised that many children adapt to this condition, and he recommended Z.D.C. follow up when she is a little older to continue to monitor and consider further treatment.  R. at 252.  Z.D.C. followed up with another orthopedist, Dr. Pearce, when she was three months old.  R. at 250.  Dr. Pearce advised Z.D.C.'s parents that she should use her right hand as much as possible, especially in the setting of picking up toys and playing with objects.  R. at 250.  Dr. Pearce recommended that Z.D.C. should follow up in one year.  R. at 250.

Z.D.C. had her one-year follow-up appointment with another orthopedist, Dr. St. Remy, when she was fourteen months old.  R. at 422–23.  Upon examination, she had shortened fingers, with no true finger function.  R. at 423.  She had difficulty manipulating objects.  R. at 423.  Otherwise, Z.D.C.'s physical examination was normal, and her mother reported she was doing well.  R. at 422.  Dr. St. Remy noted that Z.D.C.'s hand was not functional, and recommended she engage in occupational therapy and consult with a hand surgeon.  R. at 423.  He further advised

Z.D.C.'s mother on methods to increase her hand function. R. at 423. A few months later, Z.D.C. saw Dr. Dillard, a Physical Medicine and Rehabilitation doctor. R. at 423. Dr. Dillard referred Z.D.C. for occupational therapy, and to plastic surgeon to discuss possible surgical options. R. at 425.

Z.D.C. had her evaluation with a plastic surgeon on June 12, 2023. R. at 426. There, her mother reported that Z.D.C. uses her right hand but preferred her left even though it is her non-dominant hand. R. at 426. The surgeon noted that there were no good surgical options for Z.D.C. R. at 428. He advised that physical therapy might help improve her mobility and dexterity. R. at 428.

Z.D.C. had an occupational therapy evaluation on June 26, 2023. R. at 380. At the evaluation, her parents noted that Z.D.C. had some difficulties with activities of daily living, and that her play skills were impacting her independence. R. at 381. Her therapist observed that Z.D.C. had some difficulty placing coins in a piggy bank and engaging in other motor skills. R. at 381. Her therapist recommended occupational therapy visits once per week. R. at 381.

### B. Evaluations Completed by State Agency Examiners

Upon the initial level of review, state agency examiner Dr. Duckwall determined Z.D.C. had no severe impairments. R. at 54–55. At the reconsideration level of review, state agency examiner Dr. Surrusco determined Z.D.C. had less than marked limitations in moving about and manipulating objects, caring for yourself, and health and physical well-being, but otherwise found no limitations. R. at 59–60.

### C. Plaintiff's Mother's Testimony at ALJ Hearing

At the ALJ hearing, Plaintiff's Mother testified that Z.D.C. was born with Syndactyly of the right hand. R. at 35. Z.D.C. also suffers from febrile seizures when she gets sick. R. at 36.

Although Z.D.C.'s right hand is affected, her brain still considers it to be her dominant hand. R. at 49. She cannot use her hands like other kids, and needs extra help and time to do activities. R. at 36. This causes her some frustration. R. at 36. Z.D.C. also gets frustrated using her left hand, because she wants to use her right hand. R. at 37–38. She has difficulty eating using her left hand and spills a lot of food. R. at 38 .

Plaintiff's Mother testified that Z.D.C. sees an occupational therapist every Tuesday. R. at 37. She will likely see a therapist for her life so they can monitor her development. R. at 37. Her palm is growing, but her fingers are not. R. at 37. A bone is growing out of her right hand. R. at 42, 46.

Plaintiff's Mother also testified that Z.D.C. is shy around other kids at daycare. R. at 41. She looks at her hands and chooses to play on her own. R. at 41–42. She does not let others touch her hand, and will scream if someone tries to do so. R. at 42. She used to wear a prosthetic hand, but it no longer fits her. R. at 42–43. Z.D.C. has developmental delays doing things other children would do at her age, such as brushing her hair. R. at 47. She is not able to grip normally. R. at 47.

At the hearing, the ALJ and Z.D.C.'s attorney discussed additional records from Z.D.C's occupational therapy with Ivy Rehab for Kids that were not yet provided to the ALJ. R. at 31. Plaintiff's attorney noted that the occupational therapy records will show Z.D.C.'s use of her right hand is limited, and that she is still working with occupational therapists. R. at 32. The ALJ provided Z.D.C. with a thirty-day extension to obtain those records. R. at 31–32.

### III. THE ALJ'S DECISION

A minor is "disabled" for the purpose of obtaining SSI benefits under the Social Security act if the minor has "a medically determinable physical or mental impairment or combination of

impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906; *see also* 42 U.S.C. § 1382c(a)(3)(C)(i). To determine if a minor child is eligible for benefits, the ALJ conducts a three-step sequential evaluation process. § 416.924(a). At step one, the ALJ considers whether the child is working or has engaged in substantial gainful activity since the impairment. § 416.924(a), (b). At step two, the ALJ determines whether the child has a physical or mental medically determinable impairment or a combination of impairments that is severe. § 416.924(a), (c). The ALJ will determine the child is not disabled if they have engaged in substantial gainful activity at step one or they do not have any severe impairments at step two. § 416.924(b), (c). At step three, the ALJ considers whether the child's impairment or combination of impairments "meets, medically equals, or functionally equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the listings"). § 416.924(d). If the child's impairment or combination of impairments "meets, medically equals, or functionally equals" a listed impairment, then the ALJ will find the child disabled. § 416.924(a), (d)(1). The burden is on the claimant to demonstrate that the child's impairment or impairments meet, medically equals, or functionally equals a listing. *See Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

For a child to meet or medically equal a listing at step three, the impairment must be "at least equal in severity and duration to the criteria of any listed impairment." § 416.926(a). The ALJ may determine that an impairment medically equals a listed impairment if: (1) there are other findings related to the child's impairment, not included in the listing requirements, that are at least of equal medical significance to the required criteria; (2) the impairment is not described in the listings but the record contains findings that are at least of equal medical significance to those of a

closely analogous listed impairment; or (3) the child has a combination of impairments which do not meet a listing, but result in findings that are at least of medical significance to those of a closely analogous listed impairment.  § 416.926(b)(1)–(3).

If the child does not meet or medically equal a listing, the ALJ will consider whether the impairment is functionally equivalent to a listed impairment.  § 416.926a(a) (defining functional equivalence as "listing-level severity, i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain.").  To make a finding regarding functional equivalence, the ALJ uses a "whole child" approach to "account[] for all the effects of the child's impairments singly and in combination."  SSR 09-1p, 2009 WL 396031, at *2 (Feb. 17, 2009). The ALJ first considers the child's everyday functioning in all settings, including "everything [the] child does throughout the day at home, at school, and in the community," and compares the child to other children of the same age who do not have impairments.  § 416.926a(b).  Next, the ALJ uses the six domains of functioning to assess the child's capacity to perform activities.  § 416.926a(b)(1); SSR 09-1p, 2009 WL 396031, at *2.  The six domains of functioning are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  § 416.926a(b)(1).  Considering the six domains of functioning, the ALJ will find that the child's impairments functionally equal a listing if the child has marked limitations in two of the domains of functioning, or if the child has an extreme limitation in one domain of functioning.  § 416.926a(a), (d).  A marked limitation occurs when the impairment or impairments "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  § 416.926a(e)(2).  An extreme limitation occurs when the impairment or impairments

"interferes very seriously with [the child's] ability to independently initiate, sustain or complete activities." § 416.926a(e)(3).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

At step one, the ALJ found that Z.D.C. had not engaged in substantial gainful activity since the application date of July 26, 2022. R. at 18. At step two, the ALJ found that Z.D.C. had the following severe impairments: symbrachydactyly (absence of middle and distal phalanxes on digits 2 through 5, right hand); and complex febrile seizures (in the setting of an illness and fever). R. at 18.

At step three, the ALJ considered Z.D.C.'s severe impairments and found that Z.D.C.'s impairments did not meet or medically equal a listed impairment. R. at 18–19. The ALJ then considered whether Z.D.C. had an impairment or combination of impairments that functionally equals the severity of the listings. R. at 19–22. Using the "whole child" approach, the ALJ considered "how [Z.D.C.] functions at home, at school, and in the community; the interactive and cumulative effects of all the [Z.D.C.'s] medically determinable impairments on [Z.D.C.'s] activities; and the type, extent, and frequency of help [Z.D.C.] needs." R. at 19. Using the six domains of functioning to evaluate Z.D.C.'s capacity to perform activities, the ALJ made the following findings: Z.D.C. had a marked limitation in moving about and manipulating objects; a less than marked limitation in the ability to care for herself and in health and physical wellbeing; and no limitation in acquiring and using information, attending and completing tasks, and interacting and relating with others. R. at 21–22. The ALJ concluded that because Z.D.C. did not have two marked limitations or one extreme limitation in the domains of functioning, she did not meet, medically equal, or functionally equal a listing. R. at 21–22. Thus, the ALJ determined

Z.D.C. was not disabled from the application date of July 26, 2022, through the date of her decision, August 16, 2024.  R. at 23.

The ALJ's decision further noted that Plaintiff informed the ALJ of additional evidence less than five business days before the ALJ hearing.  R. at 17.  At Plaintiff's attorney's request, the ALJ left the record open for thirty days after the hearing.  R. at 17.  Plaintiff's attorney submitted an extension request after the thirty-day extension had expired.  R. at 17.  Because Plaintiff's attorney did not establish a reason under § 416.1435 for not submitting the evidence within the required timeframe, the ALJ denied the extension.  R. at 17.  The ALJ closed the record and issued a decision based on the evidence in the record.  R. at 17.

## IV.  <u>STANDARD OF REVIEW</u>

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence.  *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "It consists of 'more than a mere scintilla of evidence but may be somewhat less than a preponderance.'" *Britt v. Saul*, 860 F. App'x 256, 260 (4th Cir. 2021) (quoting *Craig*, 76 F.3d at 589).  The Court looks for an "accurate and logical bridge" between the evidence and the ALJ's conclusions. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute

our judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V.  ANALYSIS

Plaintiff's appeal to this Court raises a single challenge to the ALJ's decision: Plaintiff argues that the ALJ failed to fully develop the record because she did not obtain reports of Z.D.C.'s functioning from early intervention and preschool programs pursuant to 20 C.F.R. § 416.924a(a)(2)(ii). ECF No. 15 at 9–12. Specifically, Plaintiff contends that "[p]ursuant to the regulations, the ALJ should have obtained a report of functioning from occupational therapist Holland [] which would have described how [Z.D.C.] typically functions compared to other children her age who do not have impairments." ECF No. 10 at 10. Under the same regulation, Plaintiff contends that the ALJ should have obtained a report from Z.D.C.'s childcare providers, because that is considered a "preschool program." *Id.* Plaintiff argues that such reports would corroborate Plaintiff's Mother's testimony about her abilities, and whether Z.D.C. needs extra help or any assistive devices. *Id.* at 10–11. Further, a statement from an occupational therapy program, "could show that [Z.D.C.] has an extreme limitation in moving about and manipulating objects, or that she has a marked limitation in another domain, such as caring for herself and interacting and relating to others." *Id.* at 11. This error, according to Plaintiff, renders the ALJ's RFC determination without substantial evidence. *See id.* at 9–11.

10

In response, the Commissioner argues that the ALJ's decision was supported by substantial evidence because the ALJ was not obligated to seek additional information, and because it is the claimant's burden to present evidence of her disability. ECF No. 14 at 9. In any event, according to the Commissioner, the evidence before the ALJ was sufficient to fairly and fully assess Plaintiff's claim. *Id.* at 10. He contends that no further development of the record was required. *Id.* at 11.

Generally, the "ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record." *Cook v. Heckler*, 783 F.3d 1168, 1173 (4th Cir. 1986). The ALJ "cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Id.* However, the ALJ "is not required to function as the claimant's substitute counsel" and "only [has] a duty to develop a reasonably complete record." *Bell v. Chater*, 57 F.3d 1065 (table), [published in full-text format at 1995 WL 347142, at *4] (4th Cir. Jun. 9, 1995) (quoting *Clark v. Shalala*, 28 F.3d 828, 830–31 (8th Cir.1994)). The ALJ's duty is triggered "only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Perry v. Astrue*, No. 3:10-CV-01248, 2011 WL 5006505, at *16 (S.D.W. Va. Oct. 20, 2011) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir.2001)). A remand is warranted only if the evidentiary gap results in "unfairness or clear prejudice" to the claimant. *Id.* (citation and quotation omitted). Moreover, failing to adequately develop the record is harmless error absent a "showing that additional evidence would have been produced that might have led to a different decision." *Camp v. Massanari*, 22 Fed. Appx. 311, 2001 WL 1658913, at *1 (4th Cir. 2001) (citation omitted).

In childhood disability claims, ALJs will consider information from medical sources, including occupational therapists. § 416.924a(a). The regulations provide that, "whenever

11

possible and appropriate, we will try to get information from people who can tell us about the effects of your impairment(s) on your activities and how you function on a day-to-day basis." § 416.924a.    If a child has been identified for early intervention services because of their impairments, the regulations stress that such programs are "important sources of information about [the claimant's] functioning, and the ALJ "*will* ask for reports from the agency and individuals who provide [the claimant] with services . . . about how you typically function compared to other children your age who do not have impairments." § 416.924a(2)(ii).  The regulations require the same if a child "attends a preschool program (e.g., Headstart or a public-school kindergarten for children with special needs." *Id.*

Here, Plaintiff contends, and the Commissioner does not dispute, that Z.D.C. was identified for an early intervention service—occupational therapy.[4]  *See* ECF No. 10 at 10.  At the hearing, the ALJ and Plaintiff's attorney discussed additional records from Z.D.C.'s occupational therapy program and keeping the record open to obtain such records.  R. at 30–34.  Despite this discussion, Z.D.C.'s occupational therapy records were not received in time, and the ALJ proceeded to make a decision with only Z.D.C.'s occupational therapy evaluation, and not any additional records of her occupational therapy treatment.

In her decision, the ALJ first noted Plaintiff's Mother's testimony that Z.D.C. participates in occupational therapy once per week.  R. at 20.  The ALJ then stated the following:

> at 14-months old, [Z.D.C.] was referred for occupational therapy to work on her fine motor skills [].  After an assessment in June 2023, occupational therapy was recommended once per week. [].  There is no evidence of weekly visits through the hearing date despite the testimony at the hearing.  [Z.D.C.] was also referred for a

---

[4] Plaintiff also argues that pursuant to § 416.924a(2)(ii), the ALJ also should have obtained a report of Z.D.C.'s functioning from her childcare providers, "which can be considered a preschool program." ECF No. 10 at 10.  The Court finds that attending childcare as described at the hearing is not a "preschool program" as contemplated by § 416.924a(2)(ii), and remand is not warranted for the ALJ's failure to seek records from childcare providers.

12

prosthesis, which her mother testified that she wears, but use of a device is not documented in the record.

R. at 21.  Later in her decision discussing Z.D.C.'s limitation in health and physical well-being, the ALJ noted that Plaintiff's Mother "testified that she participates in weekly occupational therapy sessions, but the testimony is not corroborated by the evidence."  R. at 22.  The ALJ did acknowledge and incorporate Z.D.C.'s initial occupational therapy evaluation, noting that she was more persuaded by Dr. Surrusco's reconsideration findings, in part based on the initial occupational therapy evaluation.  R. at 22.  Additionally, the ALJ found that Z.D.C. had marked limitations in moving about and manipulating objects based on Plaintiff's Mother's testimony and the occupational therapy evaluation.  R. at 22.

Under these circumstances, the Court finds that the ALJ erred by failing to obtain, or attempting to obtain, Z.D.C.'s occupational therapy records.  Although Plaintiff provides no explanation why such records were not provided to the ALJ, despite the record being left open after the hearing, the regulation requires that if a child has been identified for early intervention services, the ALJ "*will ask* for reports from the agency and individuals who provide [the claimant] with services[.]"  § 416.924a(a)(2)(ii) (emphasis added).  Here, there is no evidence that the ALJ asked for such reports from *the agency and individuals* who provide Z.D.C. with services.  The ALJ had no information to corroborate Plaintiff's Mother's testimony about her impairments, or to evaluate Z.D.C.'s progress or lack thereof in occupational therapy.  This created an obvious gap in the record—the ALJ herself noted that Plaintiff's Mother's testimony regarding Z.D.C's abilities and occupational therapy was not corroborated.  Such visits, especially given that they were alleged to occur weekly, may have given the ALJ valuable insight into Z.D.C.'s functioning.  Additionally, it may have corroborated Z.D.C.'s use of a prosthesis, and given the ALJ insight into Z.D.C.'s abilities both with and without that device.

13

The Commissioner's opposition focuses on the general rules about the ALJ's duty to develop the record. *See* ECF No. 6–11. But the Commissioner's brief does not even cite—let alone explain or discuss—the applicability of § 416.924a(2)(ii) which requires that the ALJ ask for reports from early intervention service providers, such as an occupational therapist. *See id.* Where there is a specific regulation requiring the ALJ to at least attempt to obtain such reports, the Court cannot find that the ALJ's failure to do so was harmless.[5]

Moreover, the Commissioner's argument that the ALJ had sufficient evidence to fairly and fully assess Plaintiff's claim is contradicted by the ALJ's decision itself. The ALJ pointed to two instances in the record where Plaintiff's Mother's testimony was not corroborated: (1) that Z.D.C. attended weekly occupational therapy visits; and (2) that Z.D.C. wears a prothesis. R. at 21. Both statements could (and given all the evidence in the record, likely would) be corroborated by the occupational therapy records. The lack of Z.D.C.'s occupational therapy records was a clear gap in the record, and especially considering that childhood disability regulations require the ALJ to ask for such evidence, the ALJ was required to attempt to obtain that evidence.

Because the ALJ did not obtain or attempt to obtain Z.D.C.'s occupational therapy records, the Court is not able to discern whether all the relevant evidence was properly considered. The

---

[5] The Court recognizes the obvious tension between the ALJ's general duty to develop the record, and the ALJ's more specific duty in childhood disability claims to ask for reports from early intervention service providers. This tension is especially complicated by the facts that (1) Plaintiff was represented at the hearing; (2) Plaintiff's attorney specifically recognized the lack of occupational therapy notes in the record; and (3) the ALJ left the record open for an additional thirty-days for her attorney to submit additional evidence; and (4) Plaintiff's attorney failed to timely submit the additional evidence. Though not in the Fourth Circuit, one district court has held that "[a]lthough the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record - indeed, to exhort the ALJ that the case is ready for decision - and later fault the ALJ for not performing a more exhaustive investigation." *Melissa I. o/b/o R.J.R.D. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1799, 2022 WL 3358138, at *4 (W.D.N.Y. Aug. 15, 2022). But in *Melissa I.*, the Social Security Administration *attempted* to obtain education or occupational therapy records, albeit unsuccessfully. *Id.* at *10–11. Here, no attempt was made by the Social Security Administration to obtain those records, which is required by § 416.924a(a)(2)(ii).

ALJ's failure to do so constitutes legal error and renders the ALJ's decision without substantial evidence to support it. Accordingly, remand is warranted.

## VI. <u>CONCLUSION</u>

Because the ALJ erred in applying the law and because substantial evidence does not support the Commissioner's decision, the final decision of the Commissioner is **VACATED** and **REMANDED** for further proceedings.

The parties are **ADVISED** that an appeal from this Final Order may be commenced by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510. This written notice must be received by the Clerk within sixty days from the date of this Final Order.

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to the counsel of record for Plaintiff and the Commissioner.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
March 31, 2026

15